# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| UTILISAVE, LLC, a Delaware limited liability company, and MHS Venture Management Corp., | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 7796-ML |
| MIKHAIL KHENIN, | ) ) | |
| Defendant. | ) | |

## MASTER'S REPORT
### (Post-Trial)

Oral Draft Report:  January 12, 2015
Submitted on Exceptions:  May 11, 2015
Final Report:  August 18, 2015

John G. Harris, Esquire and David B. Anthony, Esquire of Berger Harris LLP, Wilmington, Delaware; Attorneys for Plaintiffs.

Mikhail Khenin, pro se Defendant.

LEGROW, Master

## I.    BACKGROUND

The background of this case and the parties' interactions is described in greater detail in the final report on the plaintiffs' motion for summary judgment (the "Final SJ Report"), issued simultaneously with this report. For the sake of clarity, I briefly will describe the parties' relationship and various disputes, but I refer the reader to the Final SJ Report for a more complete description of the factual background. The factual recitation in this report largely focuses on my resolution of disputed factual issues as I find them after trial.

### A. The Parties

Utilisave, LLC ("Utilisave") is a Delaware limited liability company that audits utility bills in an effort to help its customers, typically large companies, find savings. MHS Venture Management Corporation ("MHS") is wholly owned and managed by Michael Steifman ("Steifman"). Utilisave and MHS are the plaintiffs in this action. Steifman founded Utilisave in 1991 and hired the defendant, Mikhail Khenin ("Khenin") in 1997. By 2003, Khenin was the CEO of Utilisave. Before 2012, Utilisave was owned by MHS, Khenin, and Donna Miele ("Miele"), who was the President of Utilisave. MHS owned a 50% interest in Utilisave, Khenin owned 40%, and Miele owned the remaining 10%. MHS and Khenin were the co-managing members of Utilisave.

## B. The 2006 Agreements

In 2006, Steifman and Khenin entered into an Amended and Restated Limited Liability Company Agreement (the "Operating Agreement") as well as employment agreements naming Khenin as CEO and Steifman as an executive charged with assisting Khenin, safekeeping funds, and maintaining the company's books and records. For his services, Khenin was to be paid a salary of $289,000, which would be increased annually by the change in the Consumer Price Index, plus benefits and other perquisites. By its express terms, Khenin's employment agreement expired on January 1, 2009, unless he was terminated for cause before that date.[1]

The Operating Agreement addressed several matters at issue in this case, including restrictions on taking certain actions without the approval of the managing members, requirements for safeguarding the company's confidential information, and rules regarding distributions to members. Under the Operating Agreement, "[t]he power to manage the affairs of the company and to act on behalf of the company [was] vested exclusively in the Managing Members, acting unanimously." This meant that Khenin, even acting as CEO, could not take certain actions without approval from MHS, which was fully controlled by Steifman. A number of other corporate actions, including approving employee compensation or

---

[1] PX 36 (Operating Agreement) §§ 2.01, 3.01; PX 88 (*Steifman v. Khenin*, Index No. 14929/08 (N.Y. Sup. Ct. June 23, 2011)).

capital expenditures, except for the salaries specifically agreed to in the employment agreements, required the consent of a majority of the members.[2] The Operating Agreement also required the Members to keep confidential "data (including, but not limited to, financial information, customer lists, techniques, audit issues, procedure and analysis)"[3] and not disclose this confidential information to any unauthorized person or use it for its own account without the unanimous prior written consent of the other Members. This obligation explicitly survived the termination of Utilisave and also continued to be binding on a Member following the termination of its interest in Utilisave.[4] As to distributions, the Operating Agreement provided:

> Section 3.03 **Distributions**. All distributions will be made at the discretion of the majority of the Members. It will be presumed that cash in excess of required working capital will be distributed unless there is a compelling reason to accumulate additional cash reserves. Any distributions to the Members (other than a liquidation distribution upon the sale of all or substantially all of the Company, or any Special Distributions approved by all the Members) will be made to the Members in accordance with their relative Participating Percentages.

The method by which distributions could be approved became a source of disagreement between the parties as their relationship deteriorated.

---

[2] PX 36 § 2.03.
[3] *Id.* § 5.05.
[4] *Id.*

## C. Steifman and MHS file the New York Action

Although the execution of the Operating Agreement and the employment agreements in 2006 suggests relative harmony between Utilisave's members, whatever harmony existed was short-lived. By 2007, the relationship between Steifman and Khenin rapidly was deteriorating and in March Khenin purported to fire Steifman and unilaterally assumed control over Utilisave's operations. Under Khenin's direction, Utilisave ceased paying Steifman his salary and ceased making distributions to MHS. Ostensibly, the dispute that led to this incident involved a disagreement between Steifman and Khenin regarding how to allocate for tax purposes certain payments made by Utilisave to Steifman.[5] The parties' animus, however, was much more deep-seated, and appears – from an outsider's perspective – largely to be driven by mutual distrust and perhaps a fair amount of resentment Khenin bore toward Steifman.

After Khenin assumed *de facto* control over Utilisave, Steifman and MHS brought an action against Khenin and Utilisave in New York (the "New York Action"). In that action, Steifman and MHS brought claims for breach of contract, breach of fiduciary duty, wrongful termination, and indemnification, among other things. Utilisave and Khenin brought counterclaims against Steifman and MHS for breach of fiduciary duty, tortious interference, indemnification, and fraud. The

---

[5] PX 88.

4

New York law firm of Keane & Beane, P.C. ("Keane & Beane") represented both Utilisave and Khenin in the New York Action. Utilisave also was represented by separate counsel.

### D. Khenin unilaterally extends his employment agreement

The New York Action between the parties continued through 2008. Toward the end of that year, with his employment agreement set to expire on January 1, 2009, Khenin had a document prepared that purported to renew his employment agreement. At some point, Khenin and Miele executed a document that they dated January 7, 2009. The New York Court held that the document was not actually executed on that date, but at some later time.[6] More specifically, the New York Court concluded that Khenin's trial testimony regarding the date that document was executed was "duplicitous" and that the signatures of Khenin and Miele were backdated.[7]

Nevertheless, Khenin continued to manage Utilisave as its *de facto* CEO and paid himself the salary and benefits established by the 2006 employment agreement, including annual raises he awarded himself. In 2009, Khenin increased his salary from $323,770.00 to $333,483.00. In 2010, Khenin increased his salary to $343,487.00. Khenin's salary remained the same in 2011, until he was removed

---

[6] *Id*. at 34-36.
[7] *Id*. at 57-58.

from his position as CEO.[8]  In all, from the time he unilaterally extended his employment agreement, Khenin paid himself raises totaling $31,073.09.[9]

### E. Khenin makes distributions without the approval of MHS

After assuming sole control over Utilisave, Khenin unilaterally declared six distributions to Utilisave's members:  (1) a $100,000 distribution in April 1, 2008, (2) a $250,000 distribution on March 27, 2009, (3) a $350,000 distribution on April 19, 2010, (4) a $200,000 distribution on July 23, 2010, (5) a $150,000 distribution in February 2011, and (6) a $200,000 distribution on June 23, 2011, two hours after the New York court issued its post-trial decision.  The first three distributions were the subject of claims by MHS in the New York Action, because Khenin withheld all or a portion of those distributions from MHS for reasons the New York court concluded were invalid.[10]  MHS challenged in this action the distributions in July 2010, February 2011, and June 2011, arguing that Khenin

---

[8] Def.'s Opening Br. in Supp. of Exceptions to Draft Report (hereinafter "Exceptions Opening Br.") Ex. F.

[9] In my draft post-trial report, I calculated this figure as $41,749.  Upon further review, however, that calculation assumed that Khenin awarded himself a raise on January 1, 2009, when he in fact did not raise his salary until July 27, 2009.  Based on the evidence before me, it appears Khenin raised his salary on July 27, 2009 by $9,713 and on July 25, 2010 by another $10,004.  Thus, between July 27, 2009 and July 25, 2011, Khenin paid himself $29,430 above his salary at the time the employment agreement expired ($9,713 + $19,717).  It does not appear Khenin raised his salary in 2011 before he was terminated by the Trustee.  Assuming he received one more month's salary at the inflated rate between July 25, 2011 and August 26, 2011, the total inflated salary Khenin paid himself was $31,073.09.  *See* Exceptions Opening Br. at 9-10 & Ex. F; PX 5; PX 7.

[10] PX 88 at 6.

could not unilaterally declare distributions under Section 3.03 of the Operating Agreement.

## F. Khenin copies Utilisave's software and customer databases

In 2009, Khenin formed a wholly-owned limited liability company, which he called Venergex LLC.[11] Khenin opened a bank account for Venergex, obtained a credit card in Venergex's name, and testified that he intended to use Venergex for a "side business," although he had not decided what the business would entail.[12] At some point in February or March 2011, Khenin asked one of Utilisave's employees, Max Smelyansky, to purchase a server and desktop computer using Venergex's credit card.[13] The computers were shipped to Venergex at Khenin's home address.[14] Smelyansky also established a domain for Venergex at Khenin's request.[15] The facts admitted into evidence at trial support the conclusion that the server and desktop were owned by Venergex, as they were purchased with Venergex funds and were linked to the Venergex domain Smelyansky created.[16]

At some point in the late winter or early spring of 2011, Khenin asked Smelyansky and another Utilisave employee, Dmitri Wittal, to transfer Utilisave's

---

[11] Trial Transcript (hereinafter "Tr.") at 312-15 (Khenin); PX 40 at 5-7.
[12] Tr. at 314-15 (Khenin).
[13] *Id*. at 318 (Khenin), 444-45, 462-63 (Smelyansky).
[14] PX 19.
[15] Tr. at 446-47 (Smelyansky).
[16] *Id*. at 320-21 (Khenin), 446-47 (Smelyansky).

entire database, including its source code, software, and client list, to the computers Khenin purchased for Venergex, his potential "side business." I concluded in the Final SJ Report, and Khenin does not dispute, that all this information was confidential and qualified as a "trade secret" under Delaware law.[17] Instead, in his exceptions to my draft post-trial report, Khenin disputes my conclusion that the download was made to the Venergex computers and also contests the timing of the download and its purpose.

Notwithstanding this new argument, Khenin effectively conceded at trial that the software and client list was transferred to the Venergex computers, although he steadfastly contended that he made the transfer for purposes of maintaining a back-up for Utilisave to use in the event of an emergency. For example, Khenin responded affirmatively when asked by plaintiffs' counsel whether "[t]he Utilisave information you had transferred to your personal computers or Venergex computers kept at your home included the following categories of information: utility provider information … client information … billing information … utility usage information…?"[18] Similarly, Khenin acknowledged that Utilisave's source code "was transferred from Utilisave onto [his] personal computers kept in [his] home, purchased by a Utilisave employee,

---

[17] Final SJ Report at 35-36; Tr. at 321-32 (Khenin).
[18] Tr. at 322-23.

maybe on his lunch hour."[19]  That description matched the computers purchased

for Venergex and connected to the Venergex domain.  At trial, Khenin testified

that he previously maintained copies of this information on other computers he

kept at his house, but those computers were old and outdated and he therefore

destroyed them.[20]  In fact, Mr. Khenin explained that he used the Venergex

computers to store the "backup," rather than purchasing a separate computer using

Utilisave funds, because he maintained the "backup" in his home and he did not

have space for more than the two Venergex computers.[21]  At no point did he testify

that the 2011 downloads of the software or client lists were made to anything other

than the Venergex computers.  Both Smelyansky and Wittal testified that the

Utilisave database, including all client information, was transferred to the

Venergex computers.[22]  I found their accounts to be among the most credible

testimony offered at trial.

Although the timing of when the download occurred is not clearly

established in the record, the best evidence indicates it was done in or around

March 2011.  Although the trustee believed that the download was made at some

point after the New York court issued its post-trial decision and before Khenin was

---

[19] *Id*. at 323.  *See also id*. at 348 ("Q (Harris): And we've established have we not, that the computers at issue and referenced in the trustee's report were purchased sometime in 2011. Right?  A (Khenin): Yeah.") Khenin has not presented evidence that he purchased any computers in 2011 other than the Venergex computers.

[20] *Id*. at 336, 349.

[21] *Id*. at 345-46.

[22] *Id*. at 448-49 (Smelyansky), 466-70 (Wittal).

9

removed as CEO,[23] that conclusion apparently was based on discussions with Utilisave's employees. In contrast, Wittal testified at trial that the download occurred "around" the "wintertime" of 2010-11, basing that timeframe on the fact that he distinctly recalled it was 6:45 p.m. when he was asked to copy the database and it was dark outside.[24] That testimony, however, is not inconsistent with Wittal's and Smelyansky's testimony that the database was copied to the Venergex computers. The Venergex computers were shipped to Khenin in early March, at which point it likely would have been dark by 6:45 and it would have been within or "around" the winter season.

Khenin also maintained that the download was made as an emergency back-up and testified that he had retained copies of Utilisave's database, including its software, source code, and client information since at least 2005. According to Khenin, he first kept copies of the database on a back-up tape, which was updated monthly.[25] Khenin concedes those back-up tapes could not be used on computer equipment he maintained at home.[26] Khenin further testified that beginning in 2009 he asked Utilisave employees to copy the database to one of two computers Khenin maintained at his home. This copying purportedly occurred two to three

---

[23] PX 40 at 5-6.
[24] Tr. at 496-98 (Wittal).
[25] *Id*. at 332-33 (Khenin).
[26] *Id*. at 333 (Khenin).

times a year.[27]  Both Wittal and Smelyansky dispute Khenin's testimony, including his testimony that they were aware of – and assisted with – these "back-ups" before 2011.  In testimony I find credible, Wittal and Smelyansky disclaimed any involvement in copying databases before 2011.[28]  Further, Wittal and Smelyansky explained persuasively why such a back-up system was unnecessary and unhelpful; Utilisave already employed a separate back-up system that was updated on a weekly basis and Khenin's "backup" on the Venergex server would have been largely unusable to Utilisave employees given the software the computers used, how the Venergex server was structured, and how infrequently – according to Khenin – this backup was updated.[29]  In short, the plaintiffs succeeded in showing by a preponderance of the evidence that Khenin caused the March 2011 download to be made in order to gain a competitive advantage if he decided to start a competing business.

## G. The New York Decision

The New York court issued its post-trial decision on June 23, 2011.  In that decision, the Court held that:  (1) MHS was entitled to a judgment against Utilisave for distributions that were declared, but never paid to MHS, in April 2008, March

---

[27] *Id*. at 333-38 (Khenin).
[28] *Id*. at 450-52 (Smelyansky), 472-74 (Wittal).
[29] *Id*. at 451-53 (Smelyansky), 474-77 (Wittal).

2009, April 2010, and July 2010[30]; (2) Steifman was wrongfully terminated from Utilisave and was entitled to his salary that would have been paid under his employment agreement for the period after he purportedly was terminated; (3) Khenin's purported renewal of his employment agreement in January 2009 was without force and effect because the Operating Agreement required unanimous approval of the managing members, which Khenin did not obtain; (4) Steifman and MHS breached their fiduciary duties by withdrawing money from Utilisave's bank account, leaving Utilisave without funds to meet its payroll and other obligations; and (5) Khenin failed to prove the necessary elements of his counterclaim against Steifman for fraud. The Court ordered Utilisave to pay damages to Steifman and MHS, offset by the relatively small amount of damages the Court awarded Utilisave for Steifman's breach of fiduciary duty. An appeal was taken by Utilisave from the New York court's decision, but was not perfected.

## H. The sale of Utilisave

The disputes between the parties also led to various actions that were filed in this Court, including a Petition for Dissolution of Utilisave, which MHS filed in March 2009. The dissolution action was stayed pending resolution of the New York Action. After the New York court issued its decision and the stay was lifted,

---

[30] Although the amended complaint in the New York Action only challenged the first three distributions Khenin unilaterally declared, the parties stipulated to the amount withheld from the fourth distribution as well, and the judgment entered in New York therefore included that amount. *See Steifman v. Khenin*, Index No. 8271/07 (N.Y. Sup. Ct. July 21, 2011) (Decision and Order at Ex. M to Opening Exceptions Br.).

12

then-Chancellor Strine appointed a New York attorney, Michael Allen, Esquire, as liquidating trustee (the "Trustee").

The Trustee's efforts and the hurdles he confronted are described in greater detail in the Final SJ Report. Of the issues the Trustee confronted, one is particularly notable for purposes of this report: Khenin's copying of Utilisave's database onto the Venergex computers. On November 1, 2011, Steifman and Miele informed the Trustee that Utilisave employees were reporting that Khenin maintained a copy of Utilisave's database on a computer in his home. The Trustee interviewed Steifman, Miele, and several Utilisave employees.[31] Through these interviews, the Trustee discovered the existence of Venergex, the Venergex computers, and the copying of Utilisave's proprietary database onto those computers.[32] Up to that point, Khenin had claimed that the only Utilisave information he maintained outside the office was an outdated computer.[33] During a meeting on November 14, 2011 between the Trustee and Khenin, Mr. Khenin described the "back-ups" of Utilisave's information he purportedly had maintained in his home since 2005. The Trustee found this explanation implausible for a number of reasons.[34] The Trustee retained a technology company, Synthesis Technology Group ("Synthesis"), to review the "Venergex computers" and delete

---

[31] PX 40 at 5.
[32] *Id*. at 5-6.
[33] *Id*. at 6.
[34] *See id*. at 6-7.

from those computers any Utilisave information.[35] Khenin gave Synthesis substantial, but not complete, access to the Venergex server and desktop computer. Although the Trustee and Synthesis were reasonably confident that Synthesis deleted all Utilisave's information from the Venergex computers, they could not guarantee the information had not previously been copied to another location.[36]

Once issues were resolved regarding preserving Utilisave's confidential information and trade secrets, the Trustee turned to the task of selling the company. As described in the Final SJ Report, the Trustee performed a market check at Khenin's insistence and invited several third parties to bid on Utilisave, in addition to MHS and Khenin. MHS was the only party who submitted a bid and the Trustee recommended the sale of Utilisave as a going concern to MHS. Over Khenin's objection, then-Chancellor Strine approved the proposed sale, under which MHS purchased all the assets and liabilities of Utilisave in exchange for waiving its priority claim to proceeds of the sale of the company, as well as any legal claims or judgments MHS or Steifman had against Utilisave. The Chancellor granted the Trustee's motion to approve the transaction and dismissed the dissolution action on July 9, 2012. The transaction closed the same day.

---

[35] Notably, although the Trustee's report repeatedly refers to these computers as Venergex computers, Khenin never raised any objection to that description or attempted to correct the Trustee's characterization of the computers. From my review of the record, it appears Khenin did not present any evidence or argument to contradict the conclusion that the computers were Venergex computers until his exceptions to the post-trial draft report.

[36] PX 40 at 7.

## I. This action

Less than two months later, Utilisave and MHS filed this action against Khenin. In their amended complaint, Utilisave and MHS brought six primary claims against Khenin: (1) breach of the fiduciary duty of loyalty (Count I), (2) breach of the Operating Agreement relating to Khenin's "unauthorized" salary payments between 2009 and 2011 (Count II), (3) breach of the Operating Agreement for Khenin's alleged use of Utilisave funds to pay legal expenses for the counterclaims he personally brought in the New York Action (Count III), (4) breach of the Operating Agreement for the distributions Khenin made in 2010 and 2011 (Count IV), (5) breach of the Operating Agreement relating to Khenin's alleged misuse of Utilisave's confidential information (Count V), and (6) misappropriation of trade secrets (Count IX). The plaintiffs also brought three claims against Khenin for unjust enrichment, conversion, and waste, but those claims were not pursued by the plaintiffs at trial or in their motion for summary judgment. For his part, Khenin asserted two counterclaims against the plaintiffs: (1) breach of contract based on Khenin's claim that distributions should have been made to him under Sections 3.03 and 6.04 of the Operating Agreement, and (2) breach of contract based on Khenin's claim that distributions should have been made to him under Section 6.05 of the Operating Agreement.[37]

---

[37] Second Amended Verified Counterclaim ¶¶ 28-47.

Trial was scheduled for February 2014. After he was chosen to become the next Chief Justice of the Delaware Supreme Court, then-Chancellor Strine reassigned this case to me. At the time it was reassigned, the parties had fully briefed a motion for partial summary judgment that the plaintiffs had filed. I issued a draft summary judgment report on February 4, 2014, in which I recommended that the Court grant in part and deny in part the motion for partial summary judgment. More specifically, I recommended that the Court deny the plaintiffs' motion as to Counts I, V, and IX, because disputed factual issues precluded judgment before trial. I further recommended that the Court grant the motion as to portions of Counts II, III, and IV based on principles of collateral estoppel. I also recommended that the Court grant summary judgment in the plaintiffs' favor on Khenin's two counterclaims. Even for those counts for which I concluded summary judgment was appropriate as to Khenin's liability, trial was necessary to determine the amount of damages, if any. Because trial was set to begin in a matter of weeks, I stayed the period for taking exceptions to that report until I issued a draft post-trial report.

A three day trial was held on February 17-19, 2014. At the conclusion of trial, both parties submitted post-trial briefs. By the time briefing was complete, the plaintiffs had abandoned Count I of their complaint alleging Khenin breached his fiduciary duty of loyalty. Counts VI, VII, and VIII – alleging claims for unjust

16

enrichment, conversion, and waste – also were not addressed. On January 12, 2015, I issued a draft post-trial bench report (the "Draft Bench Report"). In that report, I concluded that the remedy the plaintiffs sought for Count II, namely to disgorge Khenin's entire salary and benefits from 2009 to 2011, was not supported by the record, but I recommended that the Court order Khenin to repay the raises he awarded himself after the employment agreement expired, plus one month's salary.[38] As to Count III, I recommended that the Court enter judgment for plaintiffs in the amount of $12,022, based on evidence that Khenin's attorneys, Keane & Beane, billed Utilisave in that amount for Khenin's personal counterclaims in the New York Action.[39] Because the plaintiffs failed to show any actual damages as a result of the three unauthorized distributions Khenin made in 2010 and 2011, I recommended that the Court award nominal damages of $1 for Count IV.[40] Finally, I concluded that Khenin had misappropriated Utilisave's trade secrets when he downloaded Utilisave's database to the Venergex computers and I recommended that the Court order Khenin to pay $19,399.64 in actual damages for Count IX, representing the costs and the Trustee's fees associated with Khenin's misappropriation, plus the plaintiffs' attorneys' fees in bringing that claim. Because Count V arose from the same conduct as Count IX, and any damages

---

[38] *Utilisave, LLC v. Khenin*, C.A. No. 7796-ML (Jan. 12, 2015) (TRANSCRIPT) (hereinafter "Draft Post-Tr. Report") at 16, 20.
[39] *Id*. at 24.
[40] *Id*. at 27-28.

would have been duplicative of the damages associated with the trade secret claim, I did not recommend that the Court award any additional damages for Count V.

Both parties filed exceptions to the Draft Bench Report, but Utilisave later withdrew its exceptions. This final report therefore addresses Khenin's exceptions to the Draft Bench Report.[41] Khenin also took exceptions to my draft report on the motion for partial summary judgment. Those exceptions are addressed in the Final SJ Report.

## II. ANALYSIS

### A. The plaintiffs are entitled to $59,697.01 as damages for Khenin's breach of Section 2.03 of the Operating Agreement.

I concluded in the Final SJ Report that Khenin breached Section 2.03 of the Operating Agreement by paying himself a salary and benefits after his employment agreement expired and without the authorization of a majority of Utilisave's members. I also explained, as had the New York court, that it was possible that Khenin could establish that he provided services to Utilisave during his tenure as acting CEO and that the amount he received as compensation for those services was reasonable. For that reason, the issue of damages was reserved for trial.

---

[41] When Khenin filed his reply brief in support of his exceptions, the submission – although timely - exceeded the word limitation in Court of Chancery Rule 171. Khenin filed a motion to amend and an amended reply brief on August 11, 2015. I recommend that the Court grant the motion to amend. Although the plaintiffs appear to oppose the motion, that opposition ignores Mr. Khenin's status as a self-represented litigant and the plaintiffs' own failure to file timely briefs. *See* Final SJ Report at 45 (recommending that the Court deny Khenin's motion to strike the plaintiffs' reply brief as untimely).

At trial, Khenin showed that the salary established in the 2006 employment agreement reflected the members' agreement as to the value of the services provided by Khenin as CEO of Utilisave. That is, the parties agreed that by the last year of Khenin's employment as CEO (2008), the value of his services warranted a salary of $323,770. During trial, the plaintiffs endeavored to show that Khenin was not, as it turned out, a particularly good CEO, and that he failed to do many of the things expected of him. Unfortunately, the plaintiffs' evidence on this point was not particularly compelling, as it largely depended on the testimony of Donna Miele, whom I found not credible as a witness. The evidence at trial showed that Khenin maintained the profitability of Utilisave during a significant economic downturn. He made decisions with which Steifman may not have agreed, but Khenin indisputably managed the company and its business in a way that allowed the company to continue to flourish. Tellingly, when Steifman took over as CEO after the Trustee was appointed, he insisted on receiving the same salary as Khenin.

For those reasons, I concluded that the services Khenin provided the company between 2009 and 2011 were approximately equal to the salary he was receiving at the time his employment agreement expired. Khenin did not show, however, that the raises he awarded himself between 2009 and 2011 were justified or reasonable. Although I believe the 2008 salary is a fair approximation of the

19

value the parties jointly attributed to the CEO's services, there is no similar evidence that the raises were justified or reasonable, particularly, again, given the broader economic pressures at the time and Khenin's unilateral action in perpetuating himself in office. For that reason, I recommend that the Court award plaintiffs damages of $31,073.09, equal to the raises Khenin gave himself after the employment agreement expired.

I also recommended in the draft report that the Court disgorge one month of Khenin's salary for his acts of disloyalty in connection with establishing Venergex and downloading Utilisave's confidential information onto the Venergex computers. I based that recommendation on the faithless servant doctrine under New York law. Although Khenin's exceptions dispute as a factual matter the reasons for the download and whether it was made to Venergex computers, I explain in Section C, below, why I am denying those exceptions. Khenin does not dispute my application of the faithless servant doctrine to those facts. Because Khenin has not taken exception to my legal conclusions, and because I have denied his exceptions to my factual conclusions, I recommend that the Court order Khenin to disgorge one month of his 2011 salary, which amounts to $28,623.92.

**B. Khenin is liable to the plaintiffs for $7,970 in attorneys' fees he caused Utilisave to pay for prosecuting his personal counterclaim in the New York Action.**

In the Final SJ Report, I concluded that the plaintiffs had submitted undisputed evidence that Keane & Beane, P.C., the firm that represented both Khenin and Utilisave in certain matters in the New York Action, had billed Utilisave for at least some of the attorneys' fees incurred in prosecuting Khenin's personal counterclaim against Steifman in that action. I therefore recommended that the Court grant the plaintiffs' motion as to Khenin's liability to repay such amounts, but reserved for trial the issue of damages.

At trial, the plaintiffs introduced all of Keane & Beane's bills and questioned Khenin regarding the bills Utilisave and Khenin received from Keane & Beane. Khenin took the position during trial that Keane & Beane separately billed him for services relating to his personal counterclaim against Steifman, pointing particularly to a letter from Keane & Beane to the Trustee stating that the firm had billed Utilisave separately for services provided the company after the New York Court's decision in June 2011, while billing Khenin individually for services associated with his counterclaim against Steifman.[42] Khenin acknowledged at trial,

---

[42] PX 32 at LT00679-80. This letter is not unassailable proof that Keane & Beane billed Khenin separately, as the letter is addressing work Keane & Beane performed after the New York Court's post-trial decision, not necessarily work before that date. Nonetheless, even if the letter can be read as Khenin suggests, it does not defeat the other evidence, including Khenin's admission that Keane & Beane at times billed Utilisave for work on Khenin's personal counterclaim.

however, one instance in which Keane & Beane had billed Utilisave for work on Khenin's personal counterclaims.[43] Khenin also provided evidence that he reimbursed Utilisave $4,297.50 for a payment that Utilisave made in the New York Action. The evidence shows that reimbursement was for transcripts for which Utilisave initially paid.[44] When asked questions at trial, however, to probe his position that he separately was billed by Keane & Beane, Khenin refused to answer those questions, taking the position that the information was protected by attorney-client privilege. For example, Khenin was asked about evidence supporting his position that he personally paid Keane & Beane for their legal services on his behalf, but he refused to answer those questions.[45] Khenin persisted in that refusal even after I instructed him to answer and even after I warned him that I would draw an adverse inference against him if he refused to answer.[46] I therefore instructed Khenin that I would draw an inference that he could not prove that he paid Keane & Beane for their legal services on his behalf.[47]

The plaintiffs took the position after trial that there were six invoices in which the billing descriptions for various entries indicated Keane & Beane had billed Utilisave for work performed on Khenin's personal counterclaim or did not

---

[43] Tr. at 703 (Khenin).
[44] PX 32 at UTLSV101144 (check #4272 dated Apr. 15, 2011); *id*. at UTLSV01548 (check #1149 dated Feb. 14, 2011).
[45] Tr. at 423-25 (Khenin).
[46] *Id*. at 425-27 (Khenin).
[47] *Id*. at 426-27 (Khenin).

22

otherwise distinguish which counterclaims were implicated, with charges totaling $16,319.50.[48] After reviewing the bills, I recommended in my draft report that the Court order Khenin to pay damages in that amount.[49] In his exceptions, Khenin provided a detailed explanation, not previously offered, supporting his position that some of the services for which the plaintiffs sought reimbursement related to work on counterclaims Utilisave had brought against MHS and Steifman. Specifically, Khenin explained that in three of the six invoices, the reference to "counterclaims" related to counterclaims Utilisave brought – or contemplated bringing – against Steifman or MHS after certain key events occurred during the New York Action.

For example, invoices dated November 5, 2010 and December 10, 2010 contain several references to an amended answer and counterclaim.[50] According to Khenin, those entries relate to a counterclaim Utilisave ultimately brought against Steifman and MHS after those parties improperly removed approximately $650,000 from Utilisave's accounts in late October 2010. The New York court ultimately concluded that Steifman breached his fiduciary duty to the company by making that withdraw and ordered Steifman to pay $10,000 in damages for that

_____

[48] Pls.'s Post-Tr. Opening. Br. at 44.
[49] My initial calculation deducted from the recommended damages the $4,297.50 that Khenin had paid Utilisave to reimburse the company for the transcript costs. That deduction was in error, however, because the fees for which plaintiffs sought repayment did not include the transcript bills originally paid by Utilisave and reimbursed by Khenin.
[50] PX 32 at LT 00228-230, LT 00223-227.

conduct.[51]  Khenin also provided evidence that the challenged charges on the January 6, 2010 invoice relate to an issue that arose during that billing period regarding Steifman's unilateral amendment to Utilisave's 2006 tax return. Notably, the plaintiffs do not respond to either of these arguments in their answering brief in opposition to the exceptions.  Given Khenin's explanation and the plainitiffs' failure to respond, I agree that Khenin should not be ordered to reimburse Utilisave for those charges.

In contrast, three other invoices contain charges that appear to relate to Khenin's personal claim against Steifman or do not clearly indicated which counterclaim was addressed in that work.  Invoices dated September 11, 2009, July 6, 2010, and March 7, 2011 contain references to work Keane & Beane performed on one or more counterclaims, as well as additional discovery requests likely related to those counterclaims.  Some of the entries directly reference Khenin's counterclaim,[52] while others are not as explicit but refer to counterclaims that more

_____

[51] PX 88 at 62-63.  Steifman returned the funds after several hearings in this Court on that issue.

[52] *See* Mar. 7, 2011 invoice at PX 32, UTLSV01137 (reference to post-trial briefing re: fraud); Sept. 11, 2009 invoice at PX 32, UTLSV01158-60 and Opening Exceptions Br. at 18-19. Khenin concedes that the challenged charges on the September 11, 2009 invoice were for his personal counterclaims, but contends he brought the issue to Mr. Beane's attention and Mr. Beane reduced the invoice by the amount related to Khenin's personal claims.  Khenin offers no proof of this and I conclude his testimony on this point was not credible, particularly in light of his refusal to answer other questions about his relationship with Mr. Beane on the basis of attorney-client privilege.  In other words, Mr. Khenin's refusal to answer the plaintiffs' questions regarding his professional relationship with Mr. Beane renders his testimony on this point unreliable and there is no other evidence in the record indicating that Keane & Beane reduced or revised the invoice to reflect this error in billing.

than likely included Khenin's personal counterclaim.[53]   Because Khenin indisputably allowed Keane & Beane to charge Utilisave for some of the firm's work on Khenin's behalf, and because Khenin has not demonstrated that the references to counterclaims in those invoices relate solely to Utilisave's counterclaims, I believe Khenin should be required to reimburse the Company for those amounts.   Although there is some uncertainty regarding the precise counterclaim referenced in those entries, Khenin – rather than plaintiffs – should bear the consequences of that uncertainty, both under settled law and because the adverse inference drawn against Khenin permits that conclusion.[54]   The total amount for which the plaintiffs seek reimbursement for those three invoices is $7,970 and I recommend the Court enter judgment against Khenin in that amount.

Khenin also argued in his exceptions to the draft report that it is not logical to assume that Keane & Beane improperly charged Utilisave for such a small sum because the firm also gave Utilisave "courtesy discounts" on several bills and those discounts exceeded the amount the plaintiffs claim was improperly billed to Utilisave. This argument is a non sequitur. It is entirely possible, if not likely, that Keane & Beane unintentionally included in Utilisave's bills certain services

---

[53] *See* July 6, 2010 invoice, PX 32 at LT 00239-41.  Although only one such counterclaim survived to the time of trial, Khenin initially brought seven counterclaims on his own behalf.
[54] *See Beard Research, Inc. v. Kates*, 8 A.3d 573, 613 (Del. Ch. 2010), *aff'd sub nom. ASDI, Inc. v. Beard Research, Inc.,* 11 A.3d 749 (Del. 2010) ("[p]ublic policy has led Delaware courts to show a general willingness to make a wrongdoer 'bear the risk of uncertainty of a damages calculation where the calculation cannot be mathematically proven.'").

provided to Khenin personally. It is even possible that Khenin did not realize the services were mis-billed. That does not alter the conclusion that Khenin should have to reimburse those funds that the company paid for Keane & Beane to pursue Khenin's personal claims. For that reason, the fact or amount of the courtesy discounts Keane & Beane gave the company has no bearing on this claim, and Khenin cannot claim those discounts somehow offset the damages he owes Utilisave.[55]

## C. Khenin misappropriated Utilisave's trade secrets and required the company to undertake costs to remedy that misappropriation.

Counts V and IX of the plaintiffs' complaint alleged that Khenin breached the Operating Agreement and Delaware law when he downloaded a copy of Utilisave's database, including billing and client information, onto the Venergex computers. In the draft post-trial report, I concluded that the plaintiffs had established that Khenin misappropriated trade secrets under the Delaware Uniform Trade Secrets Act ("DUTSA"). To establish a claim under that act, a plaintiff must prove:

(1) The existence of a trade secret as defined by the statute;

(2) Communication of the trade secret by the plaintiff to the defendant;

---

[55] Khenin also argued in his exceptions that he is entitled to attorneys' fees for the plaintiffs' bad faith conduct in pursuing this claim. Although I doubt the costs of pursuing the claim were worth the recovery the plaintiffs ultimately received, I do not believe the claim was litigated in bad faith.

26

(3) The communication was pursuant to an express or implied understanding that the secrecy of the matter would be respected; and

(4) The secret information has been improperly … used or disclosed by the defendant to the injury of the plaintiff.[56]

Khenin effectively conceded that the information he downloaded from Utilisave was a trade secret to which he had access by virtue of his position as CEO. The plaintiffs also proved the third element of their claim by reference to the Operating Agreement, in which the members agreed to maintain the confidentiality of Utilisave's information. I recommended that the Court deny summary judgment on this claim because there were disputed issues of fact regarding whether Khenin either used or disclosed the trade secrets. After trial, however, I concluded that Khenin disclosed Utilisave's trade secrets by downloading them onto a computer owned by Venergex. I reasoned that, even if Venergex was a shell company, as Khenin argued, the act of downloading the information to a Venergex computer was a disclosure, as Venergex constituted a "person" within the meaning of the DUTSA.[57] I therefore recommended that the Court award the plaintiffs actual damages plus their attorneys' fees in pursuing this claim.[58]

---

[56] *Nucar Consulting, Inc. v. Doyle*, 2005 WL 820706, at *5 (Del. Ch. Apr. 5, 2005), *aff'd*, 913 A.2d 569 (Del. 2006). *See also Savor, Inc. v. FMR Corp.*, 2004 WL 1965869 (Del. Super. July 15, 2004); *Wilmington Trust Co. v. Consistent Asset Mgmt., Inc.*, 1987 WL 8459, at *3 (Del. Ch. Mar. 25, 1987).

[57] 6 *Del. C.* § 2001(3).

[58] The DUTSA authorizes an award of attorneys' fees in the event of willful or bad faith misappropriation. 6 *Del. C.* § 2004.

Khenin disputes the factual basis for my conclusions, arguing that the evidence is "irrefutable" that he downloaded the information solely as an emergency backup for Utilisave and that there is no proof that the download was made to Venergex computers. Khenin's characterization of the trial record is inconsistent with my factual findings set forth above. To summarize, I found Khenin's testimony regarding the purpose of the download not credible, in part because it was refuted by the more credible testimony of Wittal and Smelyansky, and in part because the evidence showed that such a back-up largely would be unhelpful and also was unnecessary because of other back-up measures Utilisave had in place. Similarly, Khenin's newly minted contention that the download was not made to Venergex computers is contradicted by both his own testimony as well as the testimony of Wittal and Smelyansky. Khenin's testimony and the testimony of the other Utilisave employees was consistent that the download was made to the computers that Khenin purchased with the Venergex credit card and on which the Venergex domain was established. Under those circumstances, I believe Khenin disclosed Utilisave's trade secrets in violation of the DUTSA.

I also believe that Khenin's misappropriation of Utilisave's trade secrets was willful and done with the intent to compete with Utilisave, justifying an award of attorneys' fees. I reach that conclusion for a variety of reasons and with an understanding that "[m]isappropriation of trade secrets may be proven by

circumstantial evidence, and more often than not, plaintiffs must construct a web of perhaps ambiguous circumstantial evidence from which the trier of fact may draw inferences which convince him that it is more probable than not that what plaintiffs allege happen did in fact take place."[59] First, Khenin undoubtedly knew he maintained a working copy of Utilisave's database, but did not disclose that when the Trustee first inquired about confidential information in Khenin's possession. That secrecy is indicative of an intent to misuse the information and inconsistent with Khenin's "back-up" explanation. Second, I already have concluded that Khenin's justification for downloading the database was neither logical nor credible. Third, Khenin acknowledged that he intended to use Venergex to start a "side-business," and the download of Utilisave information onto Venergex computers strongly suggests that he intended to use Utilisave's information for his own purposes. In sum, Khenin's secrecy, his intent to start his own business, his download of Utilisave's information to computers owned by that business, and the lack of any other credible explanation for the download compels the conclusion that Khenin willfully misappropriated trade secrets for his own purposes.

---

[59] *Nucar Consulting, Inc.*, 2005 WL 820706, at *10.

Mr. Khenin also disputes my damages calculation for this claim, although he does not dispute the amount of attorneys' fees the plaintiffs seek for this claim.[60] In my draft report, I calculated the plaintiffs' actual damages from the misappropriation as $19,399.64. That calculation consisted of the costs Utilisave and the Trustee incurred in remediating the misappropriation and ensuring that the trade secrets were removed from Khenin's possession. The damages included: (i) $3,150 billed by Synthesis, the forensic IT specialist the Trustee retained to delete information from the Venergex computers and see if any copies were made, (ii) $3,964.64 in hardware and data support services incurred by the Trustee relating to the misappropriation; and (iii) $12,285 billed by the Trustee for his services relating to the misappropriation. In his exceptions brief, Khenin argues that the Synthesis bill was not paid by Utilisave directly and instead was paid by the Trustee and then included in the Trustee's bill to Utilisave as "hardware and data support services" incurred by the Trustee. In other words, Khenin established that the $3,150 awarded for Synthesis was duplicative of the amount awarded for hardware and date support services. I therefore alter my recommendation to reduce the damages by $3,150. Khenin's other criticisms, however, are make-weight. He criticizes the Trustee's bills as vague because they utilize "block billing," but any uncertainty associated with the Trustee's bills should be borne by

---

[60] Exceptions Opening Br. at 48.

Khenin, rather than the plaintiffs.[61]  I therefore recommend that the Court award the plaintiffs damages of $16,249.64, plus attorneys' fees in the amount of $3,207.50.[62]

**CONCLUSION**

For the foregoing reasons, I recommend that the Court enter judgment against Khenin in the amount of $83,917.65, plus pre-judgment and post-judgment simple interest at the legal rate.[63]  This is my final report and exceptions may be taken in accordance with Rule 144.

Respectfully submitted,

/s/ *Abigail M. LeGrow*
Master in Chancery

---

[61] *See* note 54, supra.

[62] Aff. of John G. Harris, Esq. in Support of Pls.' Award of Attorneys' Fees (Feb. 11, 2015).

[63] The plaintiffs have not provided any argument in support of awarding compound interest.  I therefore award simple interest in accordance with the statute.  6 *Del. C.* § 2301.

31